Good morning, Your Honors. May it please the Court, Justine Daniels, pro bono counsel for Petitioner Javier Adame Chavarin. We always thank and appreciate pro bono counsel, so thank you very much for handling the case. My pleasure, Your Honor. I'd like to reserve three minutes for rebuttal time. Well, I'll try to help you, but keep your eye on the clock, okay? Understood, Your Honor. Today, I'd like to bring the three key errors that the agency made in determining that my client did not qualify for deferral under the Convention Against Torture, or CAT, before the Court. Talk into the microphone a little bit. It's kind of hard to hear you well. It's kind of hard for me to reach the microphone, Your Honor. Specifically, the agency erred in failing to consider the Rosenthal Declaration. Now, that declaration is important for two reasons. Number one, it establishes the causal connection that will lead my client to be tortured in a Mexican mental institution. Secondly, and perhaps even more importantly, it addresses the issue of the animus and the intent that promotes the use of physical and chemical restraints in Mexican mental institutions, meaning the discrimination against the mentally ill. Help me with this. Yes, Your Honor. You, of course, know about our Villegas case. Yes, Your Honor. And you know that case indicated that it dealt with largely the same issues that you're litigating here, and it indicated that in order to show a claim that you had to show a specific intent by the people involved, that they intended to cause pain and torture, et cetera. Acquiescence is not enough. Where in your documentation do you show that there are specific people who have shown or would show specific intent to torture your client? And that brings me exactly back to the issue that I raised with the Court with regards to the Rosenthal Declaration. If you look at the Rosenthal Declaration, which is at AR 448 to 454, Mr. Rosenthal makes two key findings. Number one, that the pervasive discrimination against the mentally ill in Mexico causes the government to segregate them. Indeed, as a policy measure, as a matter of policy, it makes the medications necessary to address mental illness only available in its mental institutions. Secondly, the discrimination and the belief that the mentally ill are lesser and are deserving of punishment causes the government and its employees in the mental institutions to engage in the rampant use of chemical and physical restraints. Well, isn't that a general intent issue? Again, this is our case law. Viega says you've got to show that the people who are in charge intend, in this case, for your client to be tortured. I don't see that in the Rosenthal Declaration. What VIEGA stands for and what CAT requires is for the torture to be administered for purposes of punishment or discrimination. That's what the Rosenthal Declaration speaks to. Let me push you a little more. As I read the Rosenthal Declaration, if I read on AR-449, it seems to me everything that you've said comes to a head. In the AR-449 where Rosenthal says, Chevron, and I might have miss-said that, but, will more likely than not suffer torture, a broad array of other human rights violations, and a threat to his right to life if he is returned to Mexico. So, more likely than not. That's the best he can say based on everything he knows. But again, Judge Smith's been pretty straight. If you go to Cole v. Holder, it's a 2011 case. We said the applicable CAT regulations require that the torturer have the specific intent to inflict severe harm. That's at 8 CFR 1208.18A5. My worry is that this record doesn't have that. And, Your Honor, I would point you to a different portion of the Rosenthal Declaration. I would specifically point you to Paragraph 15. Again, Counsel, would you please speak into the microphone? I would direct your attention towards Paragraph 15. I did look at 15, but it seems to me that everything in that Rosenthal Declaration is summed up in what I read to you. Because, I mean, it seems to me that everything Rosenthal said in the Declaration, nonetheless, comes down to, based on what the regulations are, based on what I know the government is doing, based on that, it seems more likely than not that Chavarron is going to be tortured. But Rosenthal never does say that the government has a specific intent to torture. What Rosenthal says is that the employees of the mental institutions engage in prolonged and torturous use of chemical and physical restraints because of their discriminatory beliefs. That's the specific Paragraph 15 that I'm pointing you to. Moreover, the Court's questions raise an area that I would argue that Villegas does not reach. When the Court decided, the Court included two important caveats in Villegas. Number one, that you have to look at the country's conditions as they currently exist. And number two, it found that the Mexican government's behavior did not rise to the level of torture because it had demonstrated a movement towards improving conditions. Let me just interdict something right here. My understanding from the record is that Mr. Chavarron comes from a very wealthy family, that he had been previously institutionalized but was in a private institution, that his family has specifically said that if he needs treatment, that he would again be placed in an exclusive private institution and receive the best care available. So with no disrespect to him, how does he, in his situation, in effect, have standing to even argue the issue about public institutions? He's never been in one, has he? Your Honor, with all due respect, I would suggest that Your Honor is not recalling the record properly. I would suggest that the Court is not recalling the record properly. Mr. Chavarron does not come from a wealthy family. All of his family is located here in the United States. Now, while they are willing to do what they can for their son, their brother, there is no guarantee that they will have the wherewithal to place him in another private institution. Moreover, what the record demonstrates is that when Mr. Chavarron was previously placed in a private institution, he was subject to the same torturous practices that occur in public institutions, namely the use of long-term physical and chemical restraints. But doesn't the Rosenthal Declaration make a distinction between the public and the private facilities and say that the private facilities have better conditions than the public facilities? I say I have two minutes left, so I'm going to wrap up. The Rosenthal Declaration recognizes that the conditions may be slightly better in the private institutions, but again, under CAT case law, past experience is precedent. And when Mr. Chavarron was previously in a private institution, he was subjected to the tortures that we're discussing today. Do you want to save some time? Yes, sir. Thank you, counsel. Let's hear from the respondent, please. Thank you, and good morning. Greg Pennington on behalf of the Attorney General. The court's decision should be pretty straightforward with regard to the Convention Against Torture Claim. As it's already pointed out, the APA pretty much answers the question. I would point out at the beginning that two separate panels over the past four months have reaffirmed Villegas' unpublished decisions, including the one cited as a possibly related case in the brief. So what the court was faced with in Villegas was substantially similar, if not near identical, conditions. And I think Petitioner kind of concedes this because she hangs her hat on, or he hangs his hat on, well, the conditions are the same, therefore they must have somehow transformed into specific intent. But as Villegas said, you look at the current conditions, and the current conditions are very similar. You have Mr. Rosenthal's, not only his declaration, but his Disability Rights International report, which sent investigators out to these institutions, interviewed care workers, and they're as disturbed as people that read the reports are. One investigator saw a woman straitjacketed, as I mentioned in my brief, and when he asked why she was straitjacketed, the care worker released the straitjacket and she started beating herself against the wall until she bled. He explained that we do this because we have no other way to protect them from their behavior. And part of it's a resources question, right? Absolutely, and I think I also mentioned in the brief that the country evidence suggests that only 2 to 3 percent of the Mexican budget goes to the mental health institutions. We have a similar problem in our country, don't we? We do. Do you think somebody could bring a CAT claim against our country? Absolutely not. Okay. So I would just move on and say that not only was no specific intent shown either by the care workers, and then the Mexican government turns a blind eye to what these care workers are doing, or that there's any evidence that the Mexican government set up these conditions to specifically intend to torture mentally ill patients. But the agency also rested their decision on another ground, which is it's kind of speculation. You do have Mr. Rosenthal's declaration, which comes out and says it's more likely than not he's going to end up in a public institution and he's going to be tortured. But the other record evidence doesn't really bear that out. It's conflicting at best. As Judge Smith said, he was placed in a private institution in the past. He's never been in a public institution. He's previously been deported to Mexico, and he lived on the streets or with a friend for a month and a half before his family placed him in this private institution. His family said even though it would be hard, they would do what they can to support him. So it's speculation. He hasn't proved that each link in his speculative chain is going to wind up with him being in a public mental health institution. Going back to your first point, isn't it possible that what may start out as non-intentional inadvertence could ripen into intentionality if the government knew about the conditions and deliberately decided for whatever reason not to do anything about it? Judge Feinerman, I would agree, but there's just no evidence that they've deliberately decided to do that. The State Department report from 2013 says that they keep passing laws. They keep participating in these U.N. conventions on human rights for the mentally ill. I think the record shows at best that they're just not very good at it, but there's no evidence that they have gotten together and said, let's keep these conditions the same because we want to punish these people for being mentally ill. I just don't think the record bears that out. So halfway through, I'll move over to the administrative closure question, which this court precedent also establishes that it lacks jurisdiction over. In D.S. Covarrubias, the court held that there's no articulable standard or no statutory or regulatory basis for administrative closure, as it recognizes it's just a docket tool that the board or the immigration judge uses to manage its docket as efficiently as it can. And there's a lot of different things that go into why it manages its docket the way it does. Priorities change with administrations. As the court, I'm sure, knows, it's used regularly for prosecutorial discretion once a case has been started. So there's just, and although a matter of abitizian did come out after the court's decision in D.S. Covarrubias and list a couple of non-exhaustive factors, the fact remains that it's still a docket tool. And if the court were to exercise jurisdiction over how the agency administers its docket, it would basically be reaching into decisions and reviewing decisions, whether to prosecutorial discretionally close a case or whether it's managing its priorities right. And I don't think that's a good practice. We would have trouble with our own docket. Correct. And I think that's what matter of abitizian recognizes, that all courts have problems with their dockets, including the circuit courts, and we need to have some way that we can best manage it. Well, it seems to me that one could construe this argument is not that administrative closure per se was required, but rather due process rights were violated. Right. I think that was the argument that due process required administrative closure in this case. And as much as it can be said to be some form of relief, due process, at least substantive due process, there's no right to a discretionary form of relief. And in the end, administrative closure is a discretionary decision by the agency to close a case. But if it can be read as an overarching, he didn't receive due process in this hearing, I think the record shows that he clearly received the process he was due in a matter of MAM and the statute even Congress intended for proceedings to go forward in the cases of incompetent aliens, even if they can't appear at the hearing as long as certain safeguards are put into place to protect the aliens. As I understand it, in this case, Chavarin participated in the proceedings. He was found competent by the IJ to participate, and he did not assert any safeguards to protect his rights. Correct. And even though he participated in the hearing and was found competent and he had counsel and he had his family testify before the immigration judge, the immigration judge went on to put in several safeguards. He found him credible. He allowed recesses to take his medicine. And I think in the immigration judge's decision, he notes several safeguards that he put into place that this court has suggested for Franco litigation purposes and the board has suggested. But in all those cases, it was incompetent pro se aliens. Here, Mr. Chavarin was participating in his hearing. Clearly, his testimony demonstrates some delusions, and there's no quibbling with his mental diagnosis. He's mentally ill. But the immigration judge put several safeguards in place, didn't limit the testimony in any way, found him credible, and let him present all the evidence he could possibly present and let three counsel testify or question the witnesses. So if it can be read as an overarching due process violation, first, he hasn't shown any prejudice. Villegas pretty much shuts that down, saying that there's no specific intent by the Mexican government to torture. And I don't know how he gets over the prejudice hump there. But even procedurally, he received all the process he was due under the statute and under the board's precedent and under this court's precedent, quite frankly. I see my time is running out, so if there's no further questions from the bench, I will. Let me just ask this one question. Is there any regulation that specifically authorizes this administrative closure proceeding, or is it simply a matter of practice and common law from the BIA decisions? That's correct. There's no statutory or regulatory basis for it. The matter of Abitizian, which set out those few non-exhaustive factors, was in response to a decades-old decision from the board on administrative closure, which said that one party could basically wield a sword and stop it in its tracks. And the board said, no, we need to take a look at these decisions overall and make the decision ourself and not let the party control the docket. So there is no regulatory basis, Judge Feinerman. Any other questions? We would just ask the court to deny the petition for review. Thank you. Counsel, you have a little bit of time left. Thank you, Your Honor, and I'd like to go back to an issue that Judge Feinerman made, which is the exact issue that I was trying to reach. What Vegas leaves open is the question of when mere negligence over time then becomes specific intent. Now, counsel for the government talked a lot about the Mexican government keeps on passing laws and they're just not good at enforcing them. That's not what the D.I.R. found, what the D.R.I. found. What the D.R.I. found is that they were purposely not enforcing those laws. Moreover, if you look at the United Nations, if you look at the evidence from the United Nations, it specifically noted that it had passed no laws forbidding the use of physical and chemical restraint, and it had taken no efforts to prosecute those who engage in torture. Counsel, doesn't Vegas require specific intent as to particular people? No, Your Honor. What Vegas requires is that you have to show specific intent to torture. That can apply to classes. That's what Cole found with gang members. That's what Al-Shahar found with certain detainees in Iraq. Mr. Chavarin is a member of the class that the Mexican government intends to torture. Moreover, Mr. Chavarin is particularly at risk for the forms of torture that we're discussing because he has a history of sometimes not being compliant with his medication, because he has a history of sometimes not complying with the rules. Those factors put him at a specific risk of the chemical and physical restraints. And, again, that's exactly what happened when he was previously interred in a mental institution. Okay. You've used up your time. Let me just ask my colleagues whether they have any other questions. I guess not. Well, thank you both for your argument. We appreciate it. And, again, thank you, counsel, for your pro bono work. Are you with O'Melveny? I've forgotten. Yes, sir. Thanks to you all for your work. We always appreciate good lawyers being involved in trying to make the world a better place. So thank you. Thank you, Your Honor. The case just argued is submitted.
judges: M. Smith, N.R. Smith, Feinerman